# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 5, 2014

## STATE OF TENNESSEE v. DELQUAN BOLTON

**Appeal from the Criminal Court for Shelby County**
No. 11-03205     Chris Craft, Judge

**No. W2013-00539-CCA-R3-CD  - Filed October 21, 2014**

The defendant, Delquan Bolton, was convicted by a Shelby County Criminal Court jury of rape of a child, a Class A felony, and aggravated sexual battery, a Class B felony. He was sentenced to terms of twenty-five years and ten years, respectively, to be served concurrently in the Department of Correction. On appeal, he argues that the trial court erred in admitting character evidence and that the evidence is insufficient to sustain his convictions. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROGER A. PAGE, J., joined.

R. Todd Mosley (on appeal) and James P. DeRossitt, IV (at trial), Memphis, Tennessee, for the appellant, Delquan Bolton.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Abby Wallace and Marianne L. Bell, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of allegations of sexual abuse against the defendant by his ex-wife's daughter, who was less than thirteen years old at the time of the incidents. As a result, the defendant was indicted for one count of rape of a child and one count of aggravated sexual battery.

## State's Proof

The victim, who was thirteen years old at the time of trial, testified that she has two older brothers, one younger brother, and one younger sister. She lives in an apartment with her mother, stepfather, and siblings. The victim recalled that her mother was previously married to the defendant and that, when they were married, she lived in various apartments in Frayser and a white house on Winston Street in Memphis with her mother, the defendant, and her siblings.

The victim testified that her home life was happy while her mother and the defendant were married until the defendant "started putting his private part between [her] legs inside [her] private part." She recalled that this began after they moved from a house that was across the street from her grandmother. She clarified that by "private part" she meant penis. She said that it hurt and "didn't feel right" when the defendant put his penis in her private part and that he moved "in and out between [her] legs." She cried while it was happening. She could not recall how many times this happened, but she knew that it happened more than once at various homes in which they lived. She knew that she was in the third grade at Corning School when one of the rapes occurred, but she could not recall the other schools she attended or grades she was in when other rapes took place. The victim remembered that the abuse began when the family lived in a house before they moved to an apartment complex, then continued when they moved to the New Horizon Apartments, and later at the house on Winston Street. The victim recalled that the abuse also occurred when they lived with her aunt, although she could not remember if that was before or after they lived in the house on Winston Street. The victim identified photographs of the various apartments and homes where the abuse occurred.

The victim testified that the defendant also touched her buttocks and between her legs and told her that she "needed to start playing with [her]self more often. Putting [her] fingers between [her] legs to make [her] private hole open more." The victim elaborated that, when they lived in the apartment, the defendant touched her buttocks by sticking his hand in her pants and panties and touching "skin to skin." The defendant also touched her "front private part" under her clothes when they lived in the apartment. She said that it felt "nasty" to her and that she scooted away from him, but he moved closer to her. The victim recalled one time when they lived on Winston Street that she and the defendant were walking to the store with her little sister and brother, and the defendant told the younger children to walk ahead and he put his hand in the back of her pants. The victim wanted to tell someone what was going on with the defendant but was scared because the defendant told her that her mother would put her out of the house or beat her if she told.

The victim testified that the acts occurred when her mother was at work or otherwise out of the house. The victim recalled that her mother sometimes left the house because she and the defendant had been fighting or because the defendant had threatened her. When the victim's mother left the home because of fighting with the defendant, "[t]hat's when he'[d] start putting his private part between [the victim's] legs and [her] privates." It took place in the victim's mother's bedroom.

The victim did not recall the first time that the defendant raped her, but she recalled the last time that it happened. The last time it happened, the victim was in the kitchen at their home on Winston Street getting something from the refrigerator, and the defendant told her to come into the room next to the kitchen. The defendant made her pull down her clothes; she cried because she was scared. They were standing up, and the defendant put his "private" between her legs. It hurt and "just didn't feel right."

The victim testified that one time she saw a "whitish clear type color" substance come out of the defendant's penis. This occurred when they were living in an apartment before they moved to Winston Street. The victim had been aggravating her brothers when the defendant told her to come into his room because he was going to give her a "whooping." The defendant closed the door and told the victim to take off her clothes, and he took off his pants and underwear. The victim was crying, and the defendant held down her hands and "stuck his private in [her] private hole." He went "in and out" until he ejaculated in her and some got on the floor, just as the victim's mother arrived home. The defendant said that he did not mean to put his sperm in her, and gave her a brown towel to go into the bathroom and "wipe it out." She complied and saw semen on the towel. She described is as "whitish, clearish, bubbly." The victim heard her mother call one of her brothers. She locked herself in the bathroom and cried.

The victim testified that she ultimately decided to tell her mother about the abuse long after it occurred, while they were living with her aunt. The defendant was still living with them at the time. The victim felt that it was hard to get her mother alone to talk to her, so she followed her mother into the bathroom and told her. Her mother cried and asked why she did not tell her earlier. The victim did not stay with her mother "until she got rid of [the defendant]," which was a week or two later. The victim told her mother that she wanted the defendant to be incarcerated, and she wanted to go to counseling. The victim said that she was examined by a nurse, whom she told what had occurred with the defendant. The victim maintained that her mother did not tell her what to say during the trial.

The victim's fifteen-year-old brother testified that the defendant treated the victim differently than he treated her siblings when he was married to their mother. The victim's brother recalled one occasion when he was around ten or eleven and the victim was seven

and the children were playing outside, and the defendant told the victim to "come here" because she was "fixing to get a whooping." The victim went inside, but the victim's brother did not know what the victim had done wrong. The victim's brother recalled another occasion when he and his siblings were playing in his bedroom at the New Horizon Apartments, and the defendant called the victim to him to give her a "whooping." The victim went to their mother's room with the defendant, and the defendant closed the door. The victim's brother could hear the victim crying, and the victim stayed in the room with the defendant for a long time. He said that their mother was at church at the time. The victim's brother tried to peek into the room through the bathroom, but the door from the bathroom into their mother's bedroom was closed. When the victim finally emerged, she was crying. The victim's brother did not think that the victim misbehaved a lot.

The victim's mother testified that she married the defendant in January 2006, and he moved in with her and her children on Dunlap Street where they lived until June 2006. Thereafter, they lived in a house on Tunica Street until October 2006. In October 2006, they moved to the New Horizon Apartments, where they lived until 2008 when the victim was nine years old. After that, the family moved to a house on Maplewood Street with the victim's mother's god sister, where they lived for a couple of months until they moved to a house on Winston Street in 2008.

The victim's mother testified that, when she met the defendant, he was very attentive to her and her children, even taking the children to the zoo and different places. At times, she and the defendant got into arguments and, when the arguments were bad, she left the house to calm down. Her children remained at home with the defendant when she was away calming down. The children also stayed with the defendant on Wednesdays when she went to church, as well as when she worked. She and the defendant lived together until January 2009, and they divorced in 2010.

The victim's mother testified that, on February 9, 2009, the victim followed her into the bathroom with tears in her eyes and told her what the defendant had been doing to her. The next morning, she called the Department of Children's Services, and Ms. Jackson from the department came to their house the following day. On February 19, 2009, the victim's mother took the victim to the Children's Advocacy Center, where she was interviewed in private. They did not tell the victim's mother what the victim said, other than to tell her that the victim gave vivid details. The victim's mother then took the victim to the Rape Crisis Center on March 11, 2009, where she was interviewed and examined pursuant to the instructions given by the Children's Advocacy Center.

The victim's mother denied telling Dr. Taylor at the Rape Crisis Center that she was at church when the victim disclosed what the defendant had done to her, maintaining that she

told the nurse that they were at home when the victim disclosed the abuse. The victim's mother admitted that, in March of 2010, she posted a picture of herself and the defendant together at a Valentine's Day function at her church, which was one year after the victim disclosed that the defendant had raped her. The victim's mother acknowledged that she was smiling in the picture and that she enjoyed herself at the function. Moreover, she admitted that, in online comments to the picture, she thanked a friend's comment that she and the defendant were a cute couple.

Further, the victim's mother acknowledged that on September 14, 2009, she posted on Facebook that she planned to attend the same party as the defendant, and, on September 24, 2009, posted a picture of herself and the defendant at the party and she was smiling. On March 11, 2010, the victim's mother posted on Facebook, "[H]ad an awesome night with the hubby at Hooter's along with my brother . . .[,]" as well as, "My husband, what can I say? Man, I love that man of mine." The victim's mother also commented on Facebook about the defendant being good at barbecuing and referring to him as "baby." She again referred to the defendant as her husband on Facebook on September 21, 2009. When asked why she was not treating the defendant as a child rapist, the victim's mother responded that she was treating him like a human being. The victim's mother denied sending the defendant a message on Facebook on October 20, 2009, saying that she still had feelings for him. She said that her cousin, son, and the defendant all have access to her Facebook password. The victim's mother said that she divorced the defendant on grounds of irreconcilable differences.

The victim's mother testified that, after the victim told her about the abuse, the defendant did not live with them or come to their home again, nor was he allowed to be around the victim. However, the victim's mother admitted that she still talked to the defendant on several occasions after they separated and still loved him, even after she found out about the rapes.

Dr. Amanda Taylor examined the victim at the Rape Crisis Center on March 11, 2009; the victim was nine years old at the time. The victim had started menstruating, which indicated that she had hormones that would allow for more vaginal stretching. The victim disclosed the sexual abuse by the defendant, but there was no other history of sexual or physical abuse. Specifically, the victim said that she was raped by the defendant, elaborating that the defendant put his penis in her vaginal area, felt between her legs, and "put his private part in her bottom as well." The victim told Dr. Taylor that the abuse occurred from around March 2008 to December 2008. The doctor recalled that the victim was cooperative, but "a little tense and tearful."

Dr. Taylor testified that her examination of the victim revealed two areas of decreased hymeneal tissue, indicative of abuse. Her findings were reviewed by the nursing coordinator.

Later, the photographs that Dr. Taylor had taken were enlarged, and she determined that there was more tissue present than she initially saw during the exam. Therefore, she could neither confirm nor deny whether there was sexual abuse. However, she said that 96% of patients display no genital injury after a reported sexual assault. She explained that once females menstruate, the amount of estrogen increases causing the vaginal area to stretch, which means that injuries are often not visible. Moreover, because vaginal tissue is mucosal, meaning it tends to heal faster than other types of injuries, it is possible for injuries indicative of rape to be more visible immediately after the rape as opposed to after the passing of time. On cross-examination, Dr. Taylor recalled that the victim's mother said that she was speaking with a little girl at church when the victim broke down and told her of the abuse.

**Defendant's Proof**

Lieutenant Ivory Beck with the Memphis Police Department testified that he was assigned to investigate the victim's complaint against the defendant. He submitted a request for an indictment, at which time the case was turned over to the district attorney's office. He did not arrest the defendant.

The victim's uncle recalled spending time with the victim's mother and the defendant together even after the allegations of sexual abuse came out. He remembered that the victim's mother appeared to act "hesitant, kind o[f] weary . . . it wasn't like it was before." However, he thought that it was strange for the victim's mother and the defendant to be around each other after such serious allegations were made concerning the defendant.

Shuria Bolton, the defendant's current wife, testified that she and the defendant married on April 3, 2011. Bolton said that she has two daughters, ages sixteen and six, and has never had any cause for concern about the defendant's conduct around her daughters.

The defendant denied touching the victim inappropriately or raping her. He said that he and the victim's mother were previously married. However, they separated on January 5, 2009, and he filed for divorce in October 2010 on the grounds of irreconcilable differences. He thought that he had a good relationship with the victim's mother's five children. The defendant recalled that, between January and June or July 2008, he lived with the victim's mother and her children at the New Horizon Apartments. After that, the victim's mother and her children moved in with a friend of hers, and he moved in with his grandmother. The couple got back together and moved in with Shondra Williams Owens in late July 2008.

The defendant identified the floor plan of the house on Winston Street where he and the victim's mother and her children lived toward the end of the time period encompassed

in the indictment. He identified the washroom located off the kitchen of the house and denied that there was a curtain or door in the doorway between the washroom and the kitchen when they lived there. The defendant said that he first learned of the victim's allegations against him in February 2009 from a friend, his father, and the victim's mother's brother. In March 2009, the victim's mother called and "cussed [him] out" on the telephone.

The defendant testified that in late August or early September 2009, his grandmother passed away, and the victim's mother attended the funeral. The defendant estimated that between the time he and the victim's mother separated in January 2009 until the divorce became final, they saw each other five or six times. The defendant recalled that, when he saw the victim's mother at a mutual friend's birthday party, she was "very cordial to [him] and it was like nothing ever happened." He said that, after he did not hear any more about the sexual abuse allegations, he "thought nothing was going to come of it."

The defendant testified that the victim and her mother had a good relationship, but the victim's mother "was a little more ha[r]sher with [the victim] as far as punishment than she was the other kids." The defendant maintained that he did not do anything to the victim of which to be ashamed. He admitted that he spanked the victim on the buttocks on one occasion in 2007. He said that he also spanked one of the victim's brothers, but none of her other siblings. The defendant admitted that he and the victim's mother argued at times, and there were occasions when she left to "cool off" after an argument. The defendant described the bathroom at the New Horizon Apartments as "two in one." He explained that there was one entrance from the hallway to an area containing a toilet, sink, and tub, and then another door leading into a second toilet and sink area with a door into the bedroom that he shared with the victim's mother.

Following the conclusion of the proof, the jury convicted the defendant, as charged, of rape of a child and aggravated sexual battery.

## ANALYSIS

### I. Character Evidence

The defendant argues that the trial court erred in allowing improper character evidence concerning his prior bad acts. Specifically, he asserts that testimony regarding physical abuse and threats made by him against the victim's mother should not have been admitted because it was unfairly prejudicial towards him.

Prior to trial, the trial court conducted an evidentiary hearing pursuant to Rule 404(b) of the Tennessee Rules of Criminal Procedure concerning the defendant's prior bad acts

against the victim's mother. At the hearing, the victim's mother testified that she was previously married to the defendant and that , during their marriage, the defendant threatened to kill her and physically attacked her when they argued. He pulled a weapon on her at times. One time, he threatened and pulled a gun on both her and her sister. The victim's mother called the police on a couple of occasions, and sometimes she would leave the house when the defendant acted in a threatening manner. The victim's mother admitted that, when she would leave the house to cool down following an argument with the defendant, her children were alone at the house with the defendant. She estimated that she tended to stay away for anywhere between five and thirty minutes. She could not recall how often the defendant threatened her, but she speculated that there were two instances a week. She said that her children, including the victim, were often present when she and the defendant had verbal altercations.

The victim's mother testified that, on January 5, 2009, her son called the police because the defendant attacked her. The victim's mother elaborated that she was away from the house earlier that day, and the defendant tried to get in touch with her. She called the defendant when she was heading home, and he told her to tell her brother not to get into his business. She told her brother what the defendant said and, when she arrived home, the defendant "stormed" to the car, opened the door, and tried to "snatch" her out of the car. The victim's mother's brother grabbed her, and the defendant released his grip. The victim's mother was afraid to leave her children with the defendant because he was "in such a rage," but her brother told her to stay inside the car. The defendant ran around the car "ranting and raving about what he was going to do to [her]," and then the police arrived and arrested him. The defendant never returned to the home, except to retrieve his belongings.

The victim's mother acknowledged that after the defendant moved out, she and the defendant discussed reuniting. However, she denied sending messages to the defendant in October 2009 telling him that she wanted to get back together, or expressing her affection for the defendant on Facebook. She acknowledged that she loved the defendant, despite the fact that he beat her repeatedly.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence, subject to certain exceptions, is generally admissible under Rule 402 of the Tennessee Rules of Evidence. Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(b) provides as follows:

Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Exceptional cases in which evidence of an accused's prior bad acts will be admissible include those in which the evidence is introduced to prove identity, intent, motive, opportunity, or rebuttal of mistake or accident. State v. Drinkard, 909 S.W.2d 13, 16 (Tenn. Crim. App. 1995); see also Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[7][a] (5th ed. 2011). Where the trial judge has substantially complied with procedural requirements, the standard of review for the admission of bad act evidence is abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). Because the trial court in this matter complied with the requirements of Rule 404(b), we review its rulings under an abuse of discretion standard.

In this case, after conducting a hearing required by Rule 404(b), the trial court determined that a material issue existed other than conduct in conformity with a trait of character, that proof of the other bad act was clear and convincing, and that its probative value outweighed any danger of unfair prejudice. Specifically, the trial court determined that the evidence was relevant to the defendant's intent and motivation to assault the victim, being that "he committed these threats to have an opportunity to abuse the child or that he abused the child because he was upset at the mother." The court expressed its mindfulness of avoiding unfair prejudice in limiting the evidence of the defendant's prior abuse and threats against the victim's mother and specifically excluding evidence that the defendant had pulled a weapon on the victim's mother.

The record shows that the trial court complied with the requirements of Rule 404(b) by holding a hearing, determining that a material issue existed other than conduct in conformity with a character trait, enunciating on the record the reasons for admitting the evidence, and excluding portions of the evidence for which the court determined that the probative value would be outweighed by the danger of unfair prejudice. Accordingly, we conclude that the trial court acted properly within its discretion in allowing the State to present evidence of the defendant's prior abuse and threats against the victim's mother. We additionally note that, at trial, the victim's mother, in actuality, barely testified as to any prior bad acts of the defendant. Her testimony in this regard consisted of her stating that she and the defendant would get into arguments during their marriage and that she would sometimes leave the house to calm down. The defendant is not entitled to relief.

## II. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State ." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, or any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Id. § 39-13-501(7). Because the victim testified that the defendant raped her on more than one occasion, the State elected to prosecute the defendant for the rape that occurred in the victim's mother's bedroom at the New Horizon Apartments when the defendant held her hands down, penetrated her, and ejaculated.

"Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim [where] . . . [t]he victim is less than thirteen (13) years of age." Id. § 39-13-504(a)(4). " 'Sexual contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Id. § 39-13-501(6). The State elected to prosecute the defendant for the instance of aggravated sexual battery when the defendant touched the victim's vaginal area under her clothes, and she told him that it was "nasty."

In the light most favorable to the State, the victim described the rapes and sexual abuse in great detail, and her family confirmed that she was alone with the defendant during the times in question. Therefore, the evidence shows that the defendant sexually penetrated and had sexual contact with the victim, who was less than thirteen years old, thus supporting the defendant's convictions.

The defendant specifically argues that the evidence is insufficient to support his convictions because the doctor who examined the victim could not conclusively say that a rape had occurred; there was inconsistent testimony regarding where the victim and her mother were when the victim revealed the abuse; and the victim's mother continued to socialize with the defendant making it "inconceivable that . . . the abuse occurred."

With regard to the doctor's testimony, Dr. Taylor explained that although the amount of hymeneal tissue was inconclusive as to whether the victim had been raped, ninety-six

percent of patients reporting a sexual assault display no genital injury. She further explained that once females begin to menstruate, the amount of estrogen in the vaginal tissue increases causing the vaginal area to stretch, and the victim had already started menstruating. Dr. Taylor also stated that the tissue in the vaginal area tends to heal faster than other types of injuries, and that injuries indicative of a rape were more likely to be seen immediately after the rape and not after a lapse of time. The jury heard this testimony and was aware of the lack of conclusive physical findings. The jury also heard the victim's testimony, who gave a vivid account of the rape, even describing the defendant's semen as "white," "clearish," and "bubbly." Given Dr. Taylor's explanation for lack of conclusive physical proof and the victim's clear description of the rape, there was sufficient evidence for the jury to conclude that the defendant was guilty of rape of a child.

The defendant also contends that the evidence is insufficient because the victim's mother testified that the victim reported the abuse while they were in the bathroom, but Dr. Taylor had noted in her report that the victim's mother had said that the victim reported the abuse when they were at church. Such minor discrepancy does not render the evidence insufficient. The victim testified that she told her mother about the abuse in the bathroom at home, and the victim's mother confirmed that account. Dr. Taylor wrote in her notes that the victim's mother indicated that the abuse was disclosed to her at church. When asked about the discrepancy, the victim's mother maintained that she told Dr. Taylor that the abuse was reported at home. The jury was informed of the inconsistency and, by its verdict, accredited the testimony of the victim and her mother. We will not second-guess the jury's determination.

The defendant further contends that the evidence is insufficient because the victim's mother continued to socialize with the defendant after she learned of the rape. However, the victim's mother testified that, after the victim told her about the abuse, the defendant did not live with them or come to their home again, nor was he allowed to be around the victim. The victim's testimony was unequivocal that the defendant penetrated her and touched her sexually. The appropriateness of the victim's mother's continued relationship with the defendant has no bearing on whether the rape and sexual battery occurred. By its verdict, the jury clearly accredited the victim's testimony as true, and we will not second-guess this determination.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____

ALAN E. GLENN, JUDGE
